IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| SUSAN ANN BAYNTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05-1456-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| WILLIAM W. WYATT, in his individual | ) | |
| and official capacities; GAIL | ) | |
| WOODWORTH, in her individual and | ) | |
| official capacities; and THE PORT OF | ) | |
| PORTLAND, a port district and municipal | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

Lynn R. Nakamoto
Markowitz, Herbold, Glade
& Mehlhaf, P.C.
1211 S. W. Fifth Avenue, #3000
Portland, Oregon  97204-3730

        Attorney for Plaintiff

Paula A. Barran
Karen O'Connor
Barran Liebman LLP
601 S. W. Second Avenue, Suite 2300
Portland, Oregon 97204-3159

       Attorneys for Defendants

KING, Judge:

       Plaintiff Susan Ann Baynton brings suit against the Port of Portland (the "Port"), its

Executive Director, William Wyatt, and its Human Resources Director, Gail Woodworth, related

to the termination of plaintiff's employment in a reduction in force ("RIF").

       Before the court is defendants' Motion to Strike Plaintiff's Response to Concise

Statement of Material Facts (#59) and defendants' Motion for Summary Judgment (#40). For

the following reasons, the court denies the motion to strike and grants the motion for summary

judgment.

## PROCEDURAL BACKGROUND

       In an Opinion and Order dated January 26, 2006, I dismissed plaintiff's claim for

wrongful discharge. In that Opinion and Order I also denied defendants' motion to dismiss

plaintiff's substantive due process and equal protection claims.

       Plaintiff has withdrawn her substantive due process claim, as well as her punitive

damages claim against the Port.

       In sum, plaintiff has three remaining claims: a Section 1983 claim against the Port,

Woodworth and Wyatt for First Amendment retaliation, a Section 1983 claim against

Woodworth and Wyatt for violating her rights under the Equal Protection Clause, and a claim

against the Port for violations of the Oregon Whistleblower Law.

Page 2 - OPINION AND ORDER

## MOTION TO STRIKE

Defendants filed a Motion to Strike Plaintiff's Response to the Concise Statement of Facts. Although defendants have correctly pointed out that plaintiff's Response contains incomplete facts, I decline to strike plaintiff's submission. The court views the concise statement of facts as a guide to the evidence before it on the motion for summary judgment. While it would certainly be helpful if plaintiff's statement of facts were accurate, the decision to grant or deny summary judgment is based on the court's review of the evidence that has been submitted, not the manner in which the evidence has been described in each party's concise statement of facts. Because I do not rely on the Response, I will not rule on defendants' specific objections and I deny defendants' motion.

## FACTUAL BACKGROUND

The Port is a port district and municipal corporation. Plaintiff was the Compensation Manager in the Port's Human Resources Department. She was a seven-year employee with a track record of satisfactory performance. Woodworth had evaluated plaintiff as frequently exceeding performance expectations in June of 2004.

In 2004, Hyundai and K Line notified the Port that they were discontinuing their use of the Port for their shipping business. The loss of both carriers caused a large loss of revenue. Due to the revenue loss, Wyatt decided that a RIF was needed. Seniority was not a factor. Fifty-one people were affected by the RIF, including plaintiff. Woodworth told plaintiff on September 22, 2004 that she was included in the RIF, and that her employment would be terminated effective September 29, 2004.

Before the RIF, starting in the spring of 2004, plaintiff alleges she discussed with Woodworth many policy issues, including discrimination against African-American employees,

Page 3 - OPINION AND ORDER

management of Port resources, the politicization of hiring practices, and violations of the Equal

Pay Act. She contends that she was included in the RIF for making these statements. Facts

specific to each category of speech are set forth below.

The Human Resources Department, of which plaintiff was a part, held "Program

Managers' Meetings" during which issues of concern were raised and discussed, and which

plaintiff was required to attend. Plaintiff was also required to attend one-on-one meetings with

Woodworth during which plaintiff identified Port personnel issues and summarized historical

information about the Port.

Plaintiff reports that Woodworth referred to her as the "Ann problem." Baynton Dep.

Vol. I, 50:18-25, 99:11-23, July 25, 2006 ("Baynton Dep. I"). Plaintiff also reports that

Woodworth made statements that she was not going to tolerate people who questioned her or the

changes she was making in the department. Id. at 103:11-18. Plaintiff testified that Woodworth

"progressively, over time, had less and less contact with me and included me in less – fewer

things. Basically minimized my role in the department." Id. at 99:25-100:3. Plaintiff

remembers Woodworth making it "very clear to me that she was sick and tired of hearing my

repeated references to the [P]ort being a public sector organization, and told me to stop making

them, she was tired of hearing it from me." Id. at 106:7-11.

## DISCUSSION

I.     Plaintiff's First Amendment Claim

Plaintiff asserts her first claim for First Amendment retaliation against all defendants.

Specifically, she alleges that between February and September 2004 she challenged decisions of

defendants that involved matters of public concern. She has since identified those matters as

follows: (1) opposition to unsupported pay grade classification for Pollie Sengstake; (2)

Page 4 - OPINION AND ORDER

opposition to out-of-policy pay rates and increases for Pat Egan; (3) opposition to unequal pay increases for three HR employees in comparison to John Branam; (4) the need to carefully manage public resources given the Port's public sector status; and (5) possible discrimination against African-American employees.

A.    Legal Standards Applicable to First Amendment Claims

In a First Amendment retaliation claim, the plaintiff must show:  (1) the conduct is constitutionally protected; and (2) the protected conduct was a "substantial" or "motivating" factor in the decision to take an adverse action against her.  Then, if the defendant can prove by a preponderance of the evidence that it would have taken the same adverse action even in the absence of the protected conduct, the defendant is not liable.  Ostad v. Oregon Health Sciences University, 327 F.3d 876, 882 (9th Cir. 2003).

Alternatively, a public employer defendant is not liable if it proves that its "legitimate administrative interests outweigh the employee's interest in freedom of speech."  Pool v. VanRheen, 297 F.3d 899, 906 (9th Cir. 2002) (internal quotation omitted).

B.    Whether Plaintiff's Speech Constitutes "Protected Speech"

Defendants argue that plaintiff did not engage in any protected speech, and therefore plaintiff's claim must fail.

First, "when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employee discipline."  Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006).

Second, to be protected, the speech must address a matter of public concern.  Whether speech is protected is a question of law.  Nunez v. Davis, 169 F.3d 1222, 1230 (9th Cir. 1999).

> Whether a public employee's speech . . . involves a matter of public concern depends upon the content, form, and context of a given statement, as revealed by the whole record. A public employee's speech . . . deals with a matter of public concern when it can be fairly considered as relating to a matter of political, social, or other concern to the community. Speech that deals with complaints over internal office affairs is not protected when it is not relevant to the public's evaluation of a governmental agency's performance.

Id. at 1226 (internal quotations omitted). If the speech contains information that is both a matter of public concern and information that concerns only a private grievance, the speech can still be entitled to First Amendment protection. Pool v. VanRheen, 297 F.3d at 907.

As more specifically set forth below, taking the categories of speech one by one, I conclude that much of plaintiff's speech was made "pursuant to" her job duties as compensation manager in the Human Resources Department of the Port. As a result, she was speaking as an employee, not as a citizen. To the extent any of her speech falls outside her job duties, with one exception, it does not qualify as speech that touches on a matter of public concern. The one exception is plaintiff's speech about denied promotional opportunities to two African-American employees.

### 1.    Pollie Sengstake's Job Grade

Pollie Sengstake was hired as HR Manager for Organization Performance Management at the Port in May of 2004. Plaintiff disputed the job grade that was assigned to Sengstake. Plaintiff told Woodworth that the job grade should be 80 instead of 81. Woodworth hired Sengstake into a pay grade 80, but assigned her in the fourth quartile of grade 80 pay. In contrast, for new hires in exceptional circumstances, starting salary would be in the third quartile. During November 2004, after plaintiff's employment had been terminated, Sengstake's job was reclassified to pay grade 81. Plaintiff concedes that Sengstake's starting salary did not exceed the levels for a grade 80 job. She did not dispute the salary. A lower grade would have

Page 6 - OPINION AND ORDER

capped Sengstake's long term pay opportunity.   According to Baynton, Woodworth told her that

if she would support her in utilizing an 81 job classification grade, Baynton would also benefit

because she'd see that Baynton got moved to the 81 classification also.

Baynton's speech about Sengstake's pay grade was made "pursuant to" her job duties as

the compensation manager.  She testified that she was involved in recommending the pay grade

because Woodworth "had asked me to work with a consultant, David Splinter, to get pay grade

recommendations on the HR management positions."  Baynton Dep. I at 51:3-5.  Plaintiff also

testified that she "was looking at what appropriate pay grades would be for the position." Id. at

76:18-19.  Finally, she testified that making recommendations on "aligning that position to the

appropriate grade in the port's salary structure" was "something that I did as the compensation

manager." Id. at 80:21-81:1.  Plaintiff's speech on the question of Sengstake's pay grade is not

protected speech because she made the comments "pursuant to" her job duties as compensation

manager.

Plaintiff also told Woodworth that "not doing any kind of recruitment internally, not

providing an opportunity to internal candidates, but hiring somebody directly from the outside,

was a departure from past practice." Id. at 56:10-15.  However, it is undisputed that the Port was

not required to post positions or otherwise hire competitively.  Wyatt Dep. 174-75, Oct. 9, 2006;

Eaves Dep. 96, Oct. 23, 2006.  Plaintiff never complained to Woodworth or anyone else at the

Port that the way in which Sengstake was hired violated a specific Port policy or State law, or

that Sengstake was incompetent.  Indeed, plaintiff testified that she thought Sengstake was a

"very bright and articulate person." Baynton Dep. I at 52.  Although plaintiff did not make this

speech "pursuant to" her job duties as compensation manager, this is the kind of speech that is

more about internal office affairs rather than a matter of public concern.  Accordingly, it is not

Page 7 - OPINION AND ORDER

protected by the First Amendment.

        2.     <u>Pat Egan's Six-Month Increase</u>

Plaintiff's next category of speech was about Pat Egan, who had worked with Wyatt at

the Governor's office.  Plaintiff testified,

> What I expressed to [Woodworth] was that [Egan's] situation was not
> consistent with the parameters of the program for six-month increases, and
> explained to her that I'd specifically put a table together which articulated who
> was eligible for six-month increases and who wasn't.
>
> I went on to explain to her that – that everybody at the [P]ort would like to
> have the opportunity for a six-month increase, and yet that wasn't the case.  So I
> asked why were we doing it for this individual and why wouldn't we do it for
> others, because I had a concern that other people – in an organization that size,
> other people might come forward and also express an interest in that.
>
> I expressed to her that one of my concerns was that Mr. Egan was
> politically connected in that he was hired out of [Wyatt's] circle of associates
> from the governor's office.  He was hired by . . . a white male, a politically
> connected person out of the governor's office, who reported to [Wyatt], who was
> a white male out of the governor's office; and that in a recent business journal,
> that there were anecdotal comments from [P]ort employees saying that they were
> picking up on the fact that the organization was getting much more politically run
> and had much more of a political flavor to it.  And the references were negative
> references, not that that was viewed as a positive thing.  So the concern I voiced
> was that this could be perceived as just another indication of that movement
> towards more of a political bent in terms of how the organization is managed.

Baynton Dep. I at 183:4-184:13.  Plaintiff made these statements during the spring of 2004.

Plaintiff also testified that she was asking about Pat Egan's pay change because she

needed to know why the Port was making an exception, "so that, as the comp manager, if other

people came forward and wanted exceptions, I was able to articulate why their situation really

wasn't the sort of exception we were able to do."  <u>Id.</u> at 226:24-227:4.

It is apparent that plaintiff's statements about the six-month salary increase were made

"pursuant to" her job duties as the compensation manager, and as a result are not protected

Page 8 - OPINION AND ORDER

speech.  She referred to a table she had prepared, which was a compensation tool, and shared her

concern with Woodworth that others at the Port might want six-month increases, or might view a

six-month pay increase as being politically motivated.  Plaintiff was hired to handle

compensation issues, and her speech about Egan's salary was made "pursuant to" those duties.

3.    John Branam's Compensation

Plaintiff complained about John Branam's compensation.  She testified that her concerns

"revolved around the fact that I didn't believe [Branam] had the requisite skill to be in the HR

Consultant III and that I thought that his salary was being set artificially high without having a

basis for doing so."  Baynton Dep. Vol. II 64:3-9, Aug. 8, 2006 ("Baynton Dep. II").  In

addition, she wrote an e-mail to Woodworth, dated September 21, 2004, which she identifies as

speech related to this issue.  The e-mail reads as follows:

> I am assuming that the new approach you've outlined for promotional
> increases; i.e. 5% for a one grade change and 10% for a two grade change, will
> also apply to *all other promotions* in the organization, given that the financial
> situation the Port is currently in impacts the whole organization.  I bring this up
> because I have a list of about 10 promotional review requests to be processed with
> the annual review and want to make sure we're consistent in the message we
> given [sic] and the logic that's applied.  That is, I would hate to see us do
> something different and less for the people in HR.
>
> Taking this approach will be (is) a change to our compensation policy and
> will result, generally in 1) employees seeing lower promotional increases, and 2)
> it taking employees *longer* to arrive at a position in the pay grade with [sic] is
> consistent with performance.  This will, in turn, put more pressure on the merit
> portion of the Admin Comp program.  Essentially, from a technical comp
> perspective and as your Compensation Manager, I need to let you know that I
> believe we've compromised the pay opportunity in the admin comp program by
> taking this approach.  If, however, you tell me this is a policy change you want
> me to implement, I will do so.

Decl. of Paula A. Barran, Ex. A at 52.  Related to this topic, plaintiff sent a copy of the Equal

Pay Act, in conjunction with an e-mail describing her concern that female employees were

entitled to promotions in light of Branam's compensation, to Donna Eaves, another manager in the Human Resources department.

Plaintiff makes no mention of discrimination in pay practices nor does she reference Branham in her e-mail to Woodworth, and plaintiff offers no evidence that Woodworth knew about plaintiff's provision of the Equal Pay Act to plaintiff's peer. Like her statements regarding Sengstake's job classification, plaintiff's comments to Woodworth about John Branam's compensation and job classification, and the promotional increases she was advocating in her e-mail, were made "pursuant to" her job as the compensation manager. Indeed, in her e-mail to Woodworth, plaintiff specifically remarks, "from a technical comp perspective and as your Compensation Manager, I need to let you know that I believe we've compromised the pay opportunity in the admin comp program by taking this approach." Id. Plaintiff's speech does not constitute protected speech under Garcetti.

In addition, plaintiff responded to an interrogatory that she "objected to differential, discriminatory compensation for a male, political-connected [sic], John Branam, hired for no open position and without a competitive hiring process." Barran Decl. Ex. F at 3. Plaintiff provides no evidence, in the form of deposition testimony or other evidence, to support her claim that she made comments to Woodworth or anyone else at the Port about Branam's purported political connections or complained about the lack of a competitive hiring process. Even if she had, given the content, form and context of the speech, this is not speech that qualifies as a public concern. The undisputed evidence, summarized by Wyatt, is that,

> Branam is a young man who was referred to me by Neil Goldschmidt. He asked if I would talk to him. I did. And I suggested to Gail that she visit with him without any commitments or requirements or any sense of obligation on our part. And she did. . . . And I would say I do this a lot. People in the community frequently refer people to me who are looking for work or networking or

> whatever, and that is my uniform reaction.  If I think they're worth pursuing a
> conversation with, I'll pass them along to the appropriate person.  But it is always
> with the understanding that it is completely without any further obligation.

Wyatt Dep. 59:11-24.  Similarly, Woodworth testified that Wyatt asks for exploratory interviews on a regular basis, and that he left the decision about whether to hire Branam up to Woodworth and others.  Four people interviewed Branam before he was hired, and Woodworth testified that he "looked like a good hire."  Woodworth Dep. 77:7, Sept. 21, 2006.  As I mentioned above, it is undisputed that the Port was not required to post positions or hire competitively.  Any disagreement plaintiff may have had with Woodworth's decision to hire Branam is a matter of internal affairs.

    4.  <u>Public Sector Accountability</u>

   During 2004, plaintiff often urged Woodworth to use public funds frugally.  "I think the concerns that I voiced to [Woodworth] had to do with the organization being a public sector organization, and was suggesting that we needed to be aware of what the pay opportunities were within public sector organizations."  Baynton Dep. I at 68:14-19.  Woodworth, according to Baynton "made it very clear to me that she was sick and tired of hearing repeated references to the [P]ort being a public sector organization, and told me to stop making them, she was tired of hearing it from me."  Baynton Dep. I at 106:6-11.

   Plaintiff made all of her comments about the need for awareness of the public sector status of the Port in the context of compensation decisions.  Plaintiff relies on <u>Batt v. City of Oakland</u>, No. CV 02-04975, 2006 WL 1980401 (N.D. Cal. July 13, 2006), and claims that because there is evidence Woodworth did not want to hear plaintiff's concerns, there is evidence that her statements did not arise out of plaintiff's official duties.  I find that <u>Batt</u> is inapposite.  In that case, defendants argued that it was plaintiff's official duty to report misconduct.  The court

Page 11 - OPINION AND ORDER

ruled, however, that given the culture of the employer, plaintiff may have had a duty *not* to report. Here, defendants are not arguing that plaintiff reported her unhappiness with compensation decisions pursuant to some duty to report, such that the fact that Woodworth's demand that plaintiff stop reminding her of the Port's public sector status would be relevant. Instead, plaintiff made her reports pursuant to her job as the compensation manager.

 In sum, plaintiff made her complaints "pursuant to" her duties as the compensation manager, since they were part and parcel of her concerns about compensation levels. Accordingly, it is not protected by the First Amendment.

### 5.    Sam Fowler and Albert Matthews

Sam Fowler and Albert Matthews were two African-American employees, and in March of 2004 plaintiff spoke out about their lack of advancement during a Program Managers' meeting. Eaves also stated during that meeting that Matthews deserved a promotion. During a follow-up, in a one-on-one meeting with Woodworth, plaintiff told Woodworth that there was a problem with the way African-Americans were treated in terms of development and promotion. Plaintiff told Woodworth that personal management coaches had been hired by the Port for white managerial employees when skill gaps were identified. She told Woodworth that the recruiter had referred to both Fowler and Matthews as not being "strategic."

Defendants concede that statements like these could qualify as protected speech, but not in this context where it was part of plaintiff's job responsibility to make the statements. Defendants argue that although plaintiff was not directly responsible for promotions, the human resources managers worked together and they shared information with each other. Plaintiff mentioned her views about these two employees in a Program Managers' meeting and during one of the many regularly scheduled one-on-one meetings with Woodworth, and these were

meetings plaintiff was required to attend.

In addition, plaintiff testified that the managers "worked collaboratively and we understood that there was some overlap in the programs; so while somebody didn't have the primary responsibility for something, they may have some information that they would share with whoever did have the primary responsibility or work collaboratively with them on something." Baynton Dep. I. 135:21-136:3. Plaintiff also testified that she made the statements about Fowler and Matthews "[b]ecause I'd like to think that I was a good employee of the Port of Portland, and if I thought there was the potential of some sort of legal exposure to the organization, that I should bring that information forward to somebody who was in a position to look into it or deal with it." Id. at 132:18-24.

I am unpersuaded by defendants' argument. Under Garcetti, the proper focus is on the employee's official job duties, not necessarily on the employee's motivations–whether based on perceived job duties or personal gratification. 126 S. Ct. at 1960-61. Plaintiff was not responsible for ensuring equal employment opportunities and she did not manage the affirmative action program. Accordingly, plaintiff did not voice her concerns about the Port's potential discriminatory practices "pursuant to" her job duties.

      6.    Summary

Plaintiff's concerns about Sengstake's job grade, Pat Egan's six-month compensation increase, John Branam's compensation, and public sector accountability do not constitute protected speech under the Supreme Court's rule in Garcetti. Plaintiff was hired to tell her employer her opinions on the topic of compensation and, as such, she was not speaking as a citizen but as an employee.

Plaintiff's concerns about the absence of posting positions or otherwise competitively

Page 13 - OPINION AND ORDER

reviewing candidates does not rise to the level of a matter of public concern.

Plaintiff's concerns about hiring John Branam because of his purported political connections fails to rise to the level of a matter of public concern, given the content, form and context of the speech.

Finally, plaintiff's speaking out about discriminatory practices at the Port is a matter of public concern, and plaintiff did not make the speech "pursuant to" her job duties. As such, this speech is considered to be protected under the First Amendment.

C.    Substantial or Motivating Factor

Since plaintiff's speech about the Port's discriminatory practices against African-Americans constitutes protected conduct, plaintiff must next show that the protected conduct was a "substantial" or "motivating" factor in the decision to include her in the RIF.[1]  See Ostad, 327 F.3d at 882.

Defendants properly point out that plaintiff has adduced no facts showing that her inclusion in the RIF was due to her comments about Fowler and Matthews.  Plaintiff offers no evidence that her employer opposed her speech.  Plaintiff testified that she does not remember Woodworth saying anything to plaintiff after plaintiff disclosed the discrimination.  She didn't "remember any specific response" but thought she was "probably listening."  Baynton Dep. I. at 155:18-22.  She complains only that Woodworth failed to be proactive about the issue, and that Woodworth was "going through the motions." Id. at 159:20.  In addition, Eaves also mentioned

---

[1]Plaintiff properly pointed out at oral argument that defendants did not make this argument, specific to the First Amendment claim, until their reply brief.  However, defendants briefed the question of causation in addressing plaintiff's Whistleblower claim.  Since the arguments are the same, and since plaintiff addressed the issue of causation in her brief, plaintiff is not put at a disadvantage if I consider this argument.  Indeed, I do not rely on any of the arguments made in defendants' reply brief.

to Woodworth that Fowler and Matthews had been denied promotional opportunities, yet Eaves was not included in the RIF.

Plaintiff's evidence is insufficient to show that plaintiff's speech about Fowler and Matthews was a significant or motivating factor in her inclusion in the RIF.  The timing between the comments and the adverse employment action is not so short that questions immediately arise as to causation; she made the comments in March of 2004, and was included in the RIF in September of 2004.  Clark County School Dist. v. Breeden, 532 U.S. 268, 273-73 (2001) (per curiam) ("temporal proximity must be very close," citing cases where three and four-month periods were insufficient).  Without more, this proximity in time is insufficient to demonstrate retaliatory intent.  Bahri v. Home Depot USA, Inc., 242 F. Supp. 2d 922, 958-59 (D. Or. 2002).

Plaintiff argues that she was a seven-year employee with a good record, and yet she was included in the RIF.  However, "a lot of very significant and important and contributing people" were included in the RIF.  Wyatt Dep. 32-33.  Furthermore, Woodworth gave plaintiff a "frequently exceeds performance expectations" in June of 2004, after plaintiff made the comments about Fowler and Matthews.  This strong review undercuts plaintiff's theory that Woodworth was motivated to include plaintiff in the RIF due to plaintiff's comments about Fowler and Matthews.

Plaintiff reports that Woodworth referred to her as the "Ann problem," but that was after an e-mail message on an unrelated topic.  Woodworth's refusal to tolerate dissension was related to the changes Woodworth was making in the department, and Woodworth's comment that she would not tell Wyatt "no" was associated with Egan's six-month salary increase.

Plaintiff reports that Woodworth treated her differently–that Woodworth had "less and less contact" with plaintiff.  Baynton Dep. I at 99:25-100:3.  However, plaintiff does not relate

Page 15 - OPINION AND ORDER

any statements made by Woodworth, or conduct she took that would give substance to plaintiff's observation.  Plaintiff does not even give a time frame for this conduct.  As a result, this is merely a conclusory statement, and is not evidence from which a jury could find Woodworth opposed plaintiff's speech.

Plaintiff's remaining evidence relates to her belief that the RIF was manipulated to include her, but those facts do not speak to defendants' motivations, if any, in ensuring plaintiff was included in the RIF.  Furthermore, plaintiff does not assert that the reasons for the RIF itself were false or pretextual.

Accordingly, plaintiff offers insufficient evidence that her speech about Fowler and Matthews was a substantial or motivating factor in the decision to terminate her employment, and defendants' are entitled to summary judgment on plaintiff's First Amendment retaliation claim.

II.    Equal Protection Claim

Defendants argue that plaintiff's "class of one" theory must fail, and even if the court recognized the class, plaintiff's theory fails on the undisputed evidence.

Since the time that briefing and argument took place, the Ninth Circuit has issued an opinion holding that "the class-of-one theory of equal protection is not applicable to decisions made by public employers." Engquist v. Oregon Dep't. of Agriculture, __ F.3d __, 2007 WL 415249, * 3, *7 (9th Cir. Feb. 8, 2007).  Accordingly, I grant summary judgment to defendants on plaintiff's equal protection claim.

III.    Whistleblower Claim

Plaintiff bases her whistleblower claim on the same conduct she identifies as protected speech, set forth above.

Page 16 - OPINION AND ORDER

Plaintiff must prove:  (1) that she engaged in statutory protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal connection between the two.  See Stanich v. Precision Body and Paint, Inc., 151 Or. App. 446, 457, 950 P.2d 328 (1997). To prove causation, plaintiff must establish that "in the absence of the discriminatory motive, the employee would have been treated differently."  Hardie v. Legacy Health Sys., 167 Or. App. 425, 435-6, 6 P.3d 531 (2000), partially superseded by statute on other grounds.

A.    Whether the Speech is Covered by the Statute

ORS 659A.203(1) makes it an unlawful employment practice for a public employer to:

(b) prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonable believes is evidence of:

(A) A violation of any federal or state law rule or regulation by the state, agency or political subdivision;

(B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision. . . .

1.    Violation of Law, Rule or Regulation

Defendants assert that there are only two complaints that may be said to implicate laws under ORS 659A.203(1)(b)(A).[2]  First, plaintiff asserts that she complained Branam was paid too much in comparison to three women in the Human Resources department, in violation of the Equal Pay Act.  Defendants point out, however, that plaintiff never communicated this complaint to Woodworth.  She raised the issue in an e-mail only to a peer of hers.  To Woodworth, plaintiff only stated that she wanted the three female Human Resources employees to get higher raises

---

[2]At oral argument, plaintiff argued that the Port's compensation policy should be considered a law or regulation.  Even if the Port's compensation policy could be fairly characterized as a political subdivision's regulation, the statute limits the category of protected speech to "federal or state law, rule or regulation" and does not include local regulations.

because otherwise it would take them longer to move up the pay scale and would "put more pressure on the merit portion of the Admin Comp program." Barran Decl.   Thus, plaintiff never told Woodworth that Woodworth was violating the law.  As a result, plaintiff's speech does not qualify as protected conduct under ORS 659A.203(1)(b)(A).

The second potential violation of law was plaintiff's concern that two African-American men were denied earned promotions.  Defendants admit that this kind of comment qualifies under the statute.

### 2.    Mismanagement, Gross Waste of Funds, Abuse of Authority

In addition to identifying a statutory or regulatory violation in making out a whistleblower claim, plaintiff may demonstrate that she identified mismanagement, a gross waste of funds, abuse of authority, or substantial and specific danger to public health and safety. ORS 659A.203(1)(b)(B).  Plaintiff asserts that her speech was about mismanagement and abuse of authority.

The regulations define "mismanagement" to mean "the exercise of an executive function in a manner grossly deviating from the standard of care or competence that a reasonable person would observe in the same situation."  OAR 839-010-0010(4).  The Oregon Court of Appeals has further instructed that protected reports of "mismanagement" are those that "refer to serious agency misconduct having the effect of actually or potentially undermining the agency's ability to fulfill its public mission."  Bjurstrom v. Oregon Lottery, 202 Or. App. 162, 173, 120 P.3d 1235 (2005).  "Abuse of authority" means "to deliberately exceed or make improper use of delegated or inherent authority or to employ it in an illegal manner."  OAR 839-010-0010(1).

Here, plaintiff complains about "cronyism" and compensation practices that were not merit-based.  First, as I noted above, it is undisputed that the Port was not required to post

Page 18 - OPINION AND ORDER

positions or otherwise hire competitively.  In addition, plaintiff cannot say that the Port did not

get value for its money, and can offer no opinion about whether Sengstake, Egan or Branam

were overpaid or not.  She can only say that the Port would have saved at most $13,000 in hiring

Sengstake at a lower job grade.  In addition, plaintiff does not assert that Egan or Branam

harmed the Port in some fashion.  Indeed, the undisputed testimony is that Egan served the Port

to Wyatt's satisfaction by "[a]lmost single-handedly pass[ing] a bill which gained for us capital

resources of about 25 million dollars . . . .  And that's what I was looking for when I hired him in

the first place."  Wyatt Dep. at 176.  Finally, plaintiff admits that Woodworth, as the Director of

Human Resources, had the authority to make compensation decisions, with or without plaintiff's

agreement.  Thus, plaintiff's complaints do not disclose mismanagement or abuse of authority,

as defined in the regulations.

B.    Causation

Based on the above analysis, the only disclosures that qualify under the statute are those

plaintiff made about Fowler and Matthews.  However, as with plaintiff's Section 1983 claim,

plaintiff cannot show these comments had anything to do with her employment being

terminated.  Plaintiff believes the conversation about discrimination took place in March 2004,

six months or so before the RIF.  The absence of any comment or action taken by Woodworth

after plaintiff made these statements is telling.  Plaintiff testified, "I don't remember her saying

anything definitive at that time."  Baynton Dep. I at 158-9.  Furthermore, plaintiff identified

others who made similar comments about potential discrimination, such as Eaves, who were not

included in the RIF.  Accordingly, there is no material issue of fact remaining as to any causal

connection between plaintiff's statements about African-Americans and the Port's inclusion of

plaintiff in the RIF.  Accordingly, plaintiff's claim must fail.

Page 19 - OPINION AND ORDER

## CONCLUSION

Based on the foregoing, defendants' Motion to Strike Plaintiff's Response to Concise

Statement of Material Facts (#59)is denied and defendants' Motion for Summary Judgment

(#40) is granted.

IT IS SO ORDERED.

Dated this _____14th_____ day of March, 2007.


___/s/ Garr M. King_____
Garr M. King
United States District Judge